[Cite as *Daubel v. Dineen*, 2012-Ohio-5924.]

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

PHILLIP DAUBEL, et al.

    Appellants

    v.

ROBERT N. DINEEN, et al.

    Appellees

C.A. No.    11CA009994

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE No.    2005PC00058

DECISION AND JOURNAL ENTRY

Dated: December 17, 2012

---

MOORE, Presiding Judge.

{¶1}     Philip Daubel, Martha Wilhelm, and Lisa Bucci ("Appellants") appeal from the judgment of the Lorain County Probate Court ("the Lorain Court"). This Court affirms in part, reverses in part, and remands this matter for further proceedings consistent with this opinion.

I.

{¶2}     In 2002, Warren J. Becks executed estate planning documents, including a will and trust. Mr. Becks appointed his first cousin Robert Dineen as executor of his will and gave him a power of attorney. In 2005, Mr. Becks passed away. At the time of his passing, he was not married, he had no children, and his parents and three siblings had predeceased him. After his will was admitted to the Lorain Court, Appellants Daubel, Wilhelm and Bucci, two of Mr. Beck's nieces and one of his nephews who were not named as beneficiaries in the will or trust, filed a complaint against the estate and trust contesting the validity of the testamentary documents. In their complaint, Appellants alleged that, at the time of the execution of these

documents, Mr. Becks lacked the requisite testamentary capacity and was acting under the undue influence of Mr. Dineen.

{¶3} Appellants later sought to transfer both the will administration action (Case No. 2005ES00907) and the will contest action (Case No. 2005PC00058) to the Sandusky County Probate Court ("the Sandusky Court"), arguing that Mr. Becks was domiciled in Sandusky County on the date of his death. The trial court initially granted their request. However, Mr. Becks' estate ("the Estate") filed a motion in the Sandusky Court to transfer the cases back to the Lorain Court, and the Sandusky Court granted the motion. Ultimately, the Lorain Court exercised jurisdiction and venue over both actions.

{¶4} The Estate filed a motion for summary judgment in the will and trust contest action, arguing that the Appellants had no evidence to create a genuine question of material fact in regard to their claims, and attaching affidavits in support. Appellants opposed the motion for summary judgment, also attaching affidavits in support.

{¶5} The Lorain Court granted the Estate's motion for summary judgment and dismissed Appellants' complaint. Appellants timely filed an appeal from the Lorain Court's order and present three assignments of error for our review. We have consolidated the second and third assignments of error to facilitate our discussion.

II.

**ASSIGNMENT OF ERROR I**

THE LORAIN[ ]COURT LACKED STATUTORY JURISDICTION TO PROBATE [MR. BECK]'S LAST WILL AND TESTAMENT AND THEREFORE LACKED JURISDICTION TO HEAR THIS ACTION. FURTHER, THE LORAIN[ ]COURT COMMITTED REVERSIBLE ERROR BY SUA SPONTE ASSUMING JURISDICTION UNDER R.C. 2107.11(C) AND OVERRULING ITS PRIOR ORDER TRANSFERRING THESE PROCEEDINGS TO THE SANDUSKY[ ]COURT, DESPITE THE [LORAIN]

COURT'S ORIGINAL ENTRY FINDING THAT JURISDICTION AND VENUE WERE IMPROPER IN LORAIN COUNTY.

{¶6} In their first assignment of error, Appellants contend that the Lorain Court lacked jurisdiction over this matter and that venue was improper in that court.

{¶7} Initially, we note that, early in the proceedings below, Appellants moved the trial court to consolidate the will contest and the estate administration actions and to transfer the combined action to the Sandusky Court. The Lorain Court, through a journal entry dated October 4, 2006, granted the Appellants' motion to consolidate and transfer. Thereafter, upon consideration of the Estate's motion, the Sandusky Court determined that: (1) Mr. Becks was not domiciled in Sandusky County at the time of his death, and (2) venue in Sandusky County was improper. Accordingly, the Sandusky Court transferred the proceedings back to the Lorain Court. Significant to our discussion, the record indicates that, although the Lorain Court's October 4, 2006 journal entry had purported to consolidate the will administration and the will contest cases, when these proceedings were transferred back to the Lorain Court, it proceeded with these actions in separate cases.

{¶8} Therefore, our review of this issue is somewhat hampered by the absence of the orders pertaining to jurisdiction and venue that may have been filed solely in the will administration case. Be that as it may, several relevant orders were captioned under and/or copied to the will contest case number of 2005PC00058. For instance, on March 23, 2009, the Lorain Court set forth an order concluding that "having previously determined by journal entry dated October 4, 2006 * * * that this Court does not have venue or jurisdiction in this matter, motion to re-open denied." However, on March 31, 2009, the Lorain Court again issued an order in the will contest case stating: "Based upon the Sandusky Court denying jurisdiction and Judge Horvath permitting re-opening of Case No. 2005ES00907 [(the will administration case)] to

permit the parties a venue to have their case heard, the Court's entry of March 23, 2009 is vacated and the Motion to re-open is granted." The will administration order "permitting re-opening" is not located in the record before this Court.

{¶9} On April 21, 2009, the Lorain Court issued another order granting a motion to transfer the will contest case to the Sandusky Court, which it later vacated through an order dated June 5, 2009 because the Sandusky Court had not accepted transfer of this case. In its June 5, 2009 order, the Lorain Court further stated that, pursuant to former R.C. 2107.11(C),[1] it had jurisdiction over this matter. We agree that the trial court had jurisdiction and venue to proceed in the will contest action, but for reasons other than those stated by the trial court.

{¶10} R.C. 2101.24(A)(1)(p) provides that probate courts have the jurisdiction to "hear and determine actions to contest the validity of wills." The venue of a will contest action is determined by R.C. 2107.71(A), which provides that interested persons "may contest [the] validity [of a will] by filing a complaint in the probate court in the county in which the will or codicil was admitted to probate."

{¶11} Here, the parties do not dispute that the will was admitted to probate in the Lorain Court, and, accordingly, the instant will contest action was appropriately filed in the Lorain Court. Instead, Appellants argue that the Lorain Court lacked authority to entertain *the underlying administration action* based upon the provision of R.C. 2107.11, entitled "Jurisdiction to Probate." Based upon this, Appellants argue by extension, the Lorain Court lacked jurisdiction to entertain the will contest action.

---

[1] R.C. 2107.11(C) was renumbered as R.C. 2107.11(A)(3) due to amendments to R.C. 2107.11 effective January 13, 2012. Am.Sub. S.B. No. 124, 2011 Ohio Laws 52.

**{¶12}** This Court has held that the provisions of R.C. 2107.11 do not speak to the subject matter jurisdiction of the probate court. *In re Gavrilovich*, 9th Dist. No. 10718, 1982 WL 2808, \*2-3 (Oct. 27, 1982). An order rendered by a court that lacks subject matter jurisdiction is void. *Id.* However, an order rendered pursuant to a trial court's incorrect exercise of jurisdiction under R.C. 2107.11 is merely "voidable." *Id.* at \*3. Although "[w]hat is 'void' can always be assailed in any proceeding[,] what is 'voidable' can be assailed only in a direct proceeding instituted for that purpose[.]" *Id*., quoting 92 Corpus Juris Secundum 1023, Voidable at 1023-1024. Accordingly, a challenge to the probate court's exercise of jurisdiction pursuant to R.C. 2107.11 in the will administration proceeding was proper "by means of Civ.R. 60(B) or by direct appeal, within the respective time strictures established therein." *Gavrilovich* at \*2. Thus, Appellants' challenges to the trial court's exercise of R.C. 2107.11 jurisdiction should have been made by timely direct attack *in the will administration proceedings*. *See id*. *See also* R.C. 2107.12 (specifically providing for contest of jurisdiction of probate). As the instant appeal arises from the will and trust contest proceedings, we decline to examine the application of R.C. 2107.11 to the will administration case, as this matter is not properly before us.

**{¶13}** However, we affirm the probate court's decision to exercise jurisdiction and venue over the will contest matter, based upon the applicable statutory provisions of R.C. 2101.24(A) and R.C. 2107.71, as set forth above. *State ex rel. Deiter v. McGuire*, 119 Ohio St.3d 384, 2008-Ohio-4536, ¶ 21, quoting *State ex rel. McGrath v. Ohio Adult Parole Auth.*, 100 Ohio St.3d 72, 2003-Ohio-5062, ¶ 8 ("reviewing courts are not authorized to reverse a correct judgment on the basis that some or all of the lower court's reasons are erroneous"). There is no dispute that the Lorain Court has jurisdiction to "hear and determine actions to contest the validity" of wills pursuant to R.C. 2101.24(A)(1)(p), nor do the parties dispute that the will

contest action was filed in the same county in which the will was admitted to probate pursuant to the venue provisions of R.C. 2107.71(A).

{¶14} Accordingly, Appellants' first assignment of error is overruled, and we affirm, on other grounds, the jurisdiction and venue rulings of the Lorain Court in the will and trust contest proceeding.

## ASSIGNMENT OF ERROR II

THE LORAIN[ ]COURT COMMITTED REVERSIBLE ERROR IN GRANTING A MOTION FOR SUMMARY JUDGMENT AND FINDING [MR. BECKS] POSSESSED THE REQUIRED TESTAMENTARY CAPACITY TO EXECUTE A LAST WILL AND TESTAMENT AND REVOCABLE LIVING TRUST, WHILE ALSO BEING FREE FROM UNDUE INFLUENCE.

## ASSIGNMENT OF ERROR III

THE LORAIN[ ]COURT COMMITTED REVERSIBLE ERROR BY WEIGHING THE SUMMARY JUDGMENT EVIDENCE AND GRANTING THE MOTION FOR SUMMARY JUDGMENT, INSTEAD OF APPLYING CIVIL RULE 56 TO DETERMINE IF A GENUINE ISSUE OF MATERIAL FACT EXISTS FOR TRIAL.

{¶15} In their second assignment of error, Appellants argue that the trial court erred in granting summary judgment to the Estate. In their third assignment of error, Appellants argue that the trial court erred in weighing the evidence relative to Appellants' claims at the summary judgment stage of proceedings.

{¶16} This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996). Pursuant to Civ.R. 56(C), summary judgment is proper if:

No genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

**{¶17}** The party moving for summary judgment bears the initial burden of informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-93 (1996). The moving party must support the motion by pointing to some evidence in the record of the type listed in Civ.R. 56(C). *Dresher* at 292-93. Once this burden is satisfied, the non-moving party bears the burden of offering specific facts to show a genuine issue for trial. *Id.* at 293. The non-moving party may not rest upon the mere allegations and denials in the pleadings but instead must point to, or provide, some evidentiary material that demonstrates a genuine dispute over a material fact. *In re Fike Trust*, 9th Dist. No. 06CA0018, 2006-Ohio-6332, ¶ 10. In the context of summary judgment proceedings, the failure of a party to meet his burden as to any one of the essential elements of his claim can be dispositive. *See, e.g., Cefaratti v. Cefaratti*, 11th Dist. No. 2004-L091, 2005-Ohio-6895, ¶ 24-27.

**{¶18}** Here, the Estate moved for summary judgment on both of Appellants' claims: lack of testamentary capacity and undue influence. We will separately discuss the propriety of summary judgment on each of these claims.

Testamentary Capacity

**{¶19}** R.C. 2107.02 provides that a person who is at least eighteen years of age, of "sound mind and memory," and not under restraint may make a will. "Testamentary capacity exists when the testator has sufficient mind to understand the nature of the business in which he is engaged, to comprehend generally the nature and extent of the property which constitutes his estate," "[t]o hold in his mind the names and identity of those who have natural claims on his bounty," and "to be able to appreciate his relation to the members of his family." *Niemes v. Niemes,* 97 Ohio St. 145, 155 (1917); *see also Bland v. Graves*, 85 Ohio App.3d 644 (9th

Dist.1993), and R.C. 5806.01 (the same capacity is required to execute a revocable trust as that which is required to execute a will). The general rule is that "the mental condition of the testator at the time of making a will determines the testamentary capacity of such testator, and evidence of his mental and physical condition within a reasonable time before and after the making of the will is admissible as throwing light on his mental condition at the time of the execution of the will in question." *Oehlke v. Marks*, 2 Ohio App.2d 264, 265-266 (9th Dist.1964), quoting *Kennedy, Exr v. Walcutt*, 118 Ohio St. 442 (1928), paragraph two of the syllabus. The burden of proof in determining testamentary capacity is on the party contesting the will. *Kennedy* at paragraph six of the syllabus.

{¶20} Here, the Estate moved for summary judgment on the basis that the evidence demonstrated that there was no question of fact as to whether Mr. Becks had the requisite testamentary capacity to execute the will and trust. In support, the Estate attached the affidavits of Alice Lesiak, Dorothy Ann Glasgow, Eric Johnson, Nils Johnson, Kathleen Johnson, and John Murphy, Jr.

{¶21} In her affidavit, Alice Lesiak averred that she was one of Mr. Beck's nieces and a beneficiary of his estate under the will and trust. She stated that Mr. Becks had grown unhappy with the Appellants' actions following his stroke. At that time, Mr. Becks wished to remain in Lorain County, but Appellant Daubel moved Mr. Becks to a nursing home in Freemont, Ohio. Mr. Becks was unhappy there. Mr. Becks did not feel that Appellants had cared for him until after his stroke, and he believed they "were only after his money." In 2002, Ms. Lesiak spoke with Mr. Becks on the telephone every other day and occasionally met with him in person. During each of these occasions, Mr. Becks "demonstrated an understanding of the nature of his business, and the nature and extent of his property. He knew the names and identities of those

who had a claim to his property and appreciated his relation to his family members." Ms. Lesiak then set forth several examples of detailed conversations that she had with Mr. Becks' in 2002.

{¶22} Likewise, in her affidavit, Dorothy Ann Glasgow averred that she was one of Mr. Becks' nieces and a beneficiary of his estate. She had learned from Ms. Lesiak that Mr. Becks was unhappy with the Appellants. However, she averred that she rarely spoke with Mr. Becks after May of 2001, and most of her opinions pertaining to his competency were informed by her discussions with Ms. Lesiak. However, when she did speak with Mr. Becks, he came off as an "alert, sharp man."

{¶23} Eric Johnson averred that he was hired by Mr. Becks in 2002 to serve as Mr. Becks' counsel during a guardianship proceeding. Mr. Johnson was aware that Appellant Daubel had a power of attorney over Mr. Becks until Mr. Becks revoked the power. Mr. Johnson averred that Appellant Daubel caused Mr. Becks to be placed in an assisted care facility, resulting in Mr. Becks' increased unhappiness with the Appellants. Mr. Johnson personally met with Mr. Becks on several occasions in 2002, and "[o]n each of these occasions, [Mr.] Becks demonstrated an understanding of the nature of his business, and the nature and extent of his property." Mr. Johnson then cited to examples of Mr. Becks' competency, including his ability to independently recall changes he made to his estate plan, specifically "to recall that he had chosen to exclude the [Appellants] and that he had added Case Western Reserve, St. Ignatius High School and St. Augustine Academy as beneficiaries because these were institutions that he and his brother and sisters had attended."

{¶24} Nils Johnson averred that he is the attorney who had prepared Mr. Becks' will and trust, and that he and his wife, Kathleen Johnson, (collectively "the Johnsons") had witnessed the signing of these documents. The Johnsons averred that Mr. Becks was able to appreciate the

nature and extent of his property and to recognize his familial relations. Mr. Johnson attached authenticated copies of the will and trust to his affidavit. The Johnsons further averred that the will and trust signing had been recorded by videotape.

{¶25} John Murphy, Jr. averred that he was an attorney for Mr. Becks' estate, and, having only one videotaped copy of the signing of the estate documents, he hired a professional service to copy the VHS tape to DVD format. Mr. Murphy attached a copy of the DVD to his affidavit and authenticated it as a true and accurate copy of the videotaped execution of these documents. In the recording, Mr. Becks appears alert, coherent, and in control of his mental capacities.

{¶26} Based upon the foregoing, we conclude that the Appellees met their initial *Dresher* burden of "informing the trial court of the basis for the motion and pointing to parts of the record that show the absence of a genuine issue of material fact" in regard to testamentary capacity. *See Dresher* at 292-93. Therefore, Appellants bore the reciprocal burden of establishing the existence of a material fact. *See id.* at 293.

{¶27} In their response, Appellants argued that a question of fact existed as to whether Mr. Becks lacked capacity to execute the estate documents, and Appellants attached the affidavits of Philip Daubel, Martha Wilhelm, Timothy Wynkoop, and Darlene Barnes in support. Mr. Daubel averred that his sisters' and his own families had regular contact with Mr. Becks, visiting him at his apartment, taking him to lunch, bringing him to their homes, and celebrating holidays with him. After Mr. Becks' stroke, he moved into an assisted living facility because he was no longer physically able to live by himself. "He had suffered a stroke that affected the left side of his body, he was legally blind, was a diabetic, and was showing signs of dementia after his stoke." He would occasionally get lost, inquire of the whereabouts of a long-ago deceased

cat, and forget that he had visitors. Based upon Mr. Daubel's observations, he averred that Mr. Becks "was no longer able to make his own decisions and his memory and decision making abilities were non-existent."

{¶28} In her affidavit, Ms. Wilhem averred that she is Mr. Daubel's sister and was Mr. Beck's niece. Like Mr. Daubel, Ms. Wilhem maintained that her brother's, her sister's, and her own families would regularly visit Mr. Becks at the assisted living facility. Ms. Wilhem averred that, by March of 2002, Mr. Becks "was showing clear signs of diminished mental capacity," and would occasionally get lost. Around this time Mr. Becks began inquiring about a long-ago deceased cat. He would often forget that he had visitors. When Ms. Wilhem spoke with Mr. Becks about his will and trust, explaining to him that omitting her and her siblings would cause a disinheritance of their children, Mr. Becks replied that "he would never think of disinheriting anyone, especially his grandnieces and grandnephews," and he appeared to not understand what Ms. Wilhem was talking about.

{¶29} Dr. Wynkoop averred that he is a psychologist who evaluated Mr. Becks in 2001, following his stroke. Dr. Wynkoop again evaluated Mr. Becks in August of 2002, at the request of the Sandusky Court. During both evaluations, Dr. Wynkoop assessed that Mr. Becks "demonstrated mental deficits in orientation, speed of information processing, memory, vision, mental flexibility (the ability to integrate and manipulate information) and mobility." However, Dr. Wynkoop determined that Mr. Beck's stroke did not impact all of his cognitive functions, "as areas of his cognitive function that allowed him to carry on conversations, access long term memory, and perform some basic day[-]to[-]day functions (with assistance from nursing home staff) remained intact and masked the changes to the areas of his cognitive function that control acquisition of new information (learning), orientation, ability to process information, and

judgment." In August of 2002, Dr. Wynkoop diagnosed Mr. Becks with cerebrovascular dementia, and with cognitive disorder and personality change, both due to stroke. Based upon his evaluations and review of the taped signing of the estate documents, Dr. Wynkoop opined "within a reasonable degree of professional certainty," that Mr. Becks "did not have the necessary judgment, reasoning, and cognitive function to fully understand the nature of the business in which he was engaged on April 4, 2002," that he was "not able to comprehend the nature and extent of his property on April 4, 2002," and that he was "not able to appreciate his relationship to his family members," on April 4, 2002.

{¶30} Another psychologist, Darlene Barnes, who evaluated Mr. Becks on March 26, 2002, in contemplation of a guardianship proceeding, also provided an affidavit. Dr. Barnes averred that her evaluation revealed that Mr. Becks suffered from distraction, and exhibited confusion and short term memory impairment. In addition, Mr. Becks' memory was not reliable, he had "lost his ability to plan ahead, his ability to organize information, his ability to sequentially relate to that information, and his capacity for abstract reasoning." Based upon her evaluation, Dr. Barnes determined that Mr. Becks had symptoms "consistent with vascular dementia with depressed mood, related to his stroke," and opined "[w]ithin a reasonable degree of medical certainty," that "Mr. Becks was incompetent on March 26, 2002 and that he lacked the required mental capacity to appreciate his property and financial and legal affairs," and that he "did not understand the nature and extent of his property and was easily confused regarding his relationship with family members." Dr. Barnes then authenticated a copy of her psychological evaluation, which she attached to her affidavit.

{¶31} When viewing this evidence in the light most favorable to the Appellants, we conclude that the trial court erred in granting summary judgment to the Appellees on the claim

regarding testamentary capacity. The parties submitted competing evidence as to whether Mr. Becks had "sufficient mind to understand nature of the business in which he is engaged," whether he was able "to comprehend generally the nature and extent of the property which constitute[d] his estate," whether he could "hold in his mind the names and identity of those who have natural claims on his bounty," and whether he could "appreciate his relation to the members of his family" at the time he signed the will. *See Niemes* at 155. Although the individuals who were present with Mr. Becks at the time he executed the estate documents averred that he had the requisite capacity, Dr. Wynkoop reviewed the recorded will signing, and, based upon his evaluations of Mr. Becks, opined that Mr. Becks did not understand the nature of his business and his relationships to family members when he signed the documents. *Compare Fisher v. Jewell*, 4th Dist. No. 01CA9, 2002-Ohio-418, *4 (evidence of decedent's "intermittent" confusion on the days surrounding will signing insufficient to overcome summary judgment in favor of the decedent's estate, which submitted uncontroverted affidavits attesting that "decedent was competent and not confused *at the time he executed the will*." (Emphasis added.))

**{¶32}** Here, the affidavits submitted for and against summary judgment provide competing inferences as to Mr. Beck's capacity at the time he signed the will. Summary judgment is an inappropriate mechanism to weigh competing inferences from the evidence; instead, it is appropriate to determine only if a question of fact exists. *See* Civ.R. 56(C), and *Temple* at 327. Here, viewing the evidence most strongly in favor of Appellants, we conclude that a triable question of fact existed as to Mr. Becks' testamentary capacity at the time he executed the documents, which precluded summary judgment on this claim. Accordingly, to the extent that Appellant's second and third assignments of error challenge the grant of summary

judgment to the Estate on the claim regarding testamentary capacity, Appellant's assignments of error are sustained.

Undue Influence

**{¶33}** R.C. 2107.74 provides in part, "On the trial of any will contest under section 2107.71 of the Revised Code, the order of probate is prima-facie evidence of the attestation, execution, and validity of the will or codicil." As part of this presumption of validity, "[a] presumption arises from the order of admission of the will to probate that the testator was free from restraint. The burden of proving undue influence is upon the contestants * * *." *Krischbaum v. Dillon*, 58 Ohio St.3d 58, 64 (1991), quoting *West v. Henry*, 173 Ohio St. 498, 502 (1962) (construing former R.C. 2741.45, which contains substantively similar language to that currently set forth in R.C. 2107.74).

**{¶34}** The Ohio Supreme Court has stated that "undue influence to avoid a will must so overpower and subjugate the mind of the testator as to destroy his free agency and make him express the will of another rather than his own, and the mere presence of influence is not sufficient. Undue influence must be present or operative at the time of the execution of the will resulting in dispositions which the testator would not otherwise have made." *West* at 501. The essential elements of undue influence are: (1) a susceptible testator, (2) another's opportunity to exert influence on the testator, (3) the fact of improper influence exerted or attempted, and (4) a result showing the effect of such influence. *West* at 510–511. *See also* R.C. 5804.06 ("A trust is void to the extent its creation was induced by * * * undue influence * * * [which has] the same meaning[ ] for trust validity purposes as [it has] for purposes of determining the validity of a will.").

{¶35} In its motion, the Estate argued that there existed no evidence supporting Appellants' claim for undue influence. In support, Eric Johnson's affidavit set forth that Mr. Becks was not under any duress during his meetings with him in 2002, and Mr. Becks had chosen Mr. Dineen as his executor because he trusted Mr. Dineen. Nils Jonson averred in his affidavit that Mr. Becks was not under duress during his meetings with him, and that "[a]ll of the decisions regarding his estate plan [that Mr. Johnson] prepared for him were made independently by Mr. Becks." Nils and Kathleen Johnson attested that Mr. Becks did not appear to be under any outside influence when he executed his testamentary documents, and they further averred that Mr. Dineen was not present during the signing of these documents. Thus, the Estate pointed to "some evidence" which demonstrates the absence of the third required element of undue influence, namely: "the fact of improper influence attempted or exerted." *See Dresher* at 292-293 (moving party must point to "some evidence" that nonmoving party cannot prove its case), and *West* at 510-511 (fact of attempted or exerted improper influence is an essential element of claim for undue influence); *see also Kryder v. Kryder*, 9th Dist. No. 25665, 2012-Ohio-2280, ¶ 30, 34 (to satisfy initial *Dresher* burden, moving party must point to some evidence that nonmoving party cannot meet at least one essential element of claim on which the nonmoving party bears the ultimate burden of proof).

{¶36} In *Kryder*, this Court reviewed a procedurally similar case. There, the testator's daughter challenged the validity of her mother's will, arguing in part that it was the product of undue influence exercised on testator by her sons. *Id.* at ¶ 6. The trial court granted summary judgment to the sons, and the daughter appealed. *Id.* at ¶ 8. On review of the evidence presented, we determined that the sons had pointed to some evidence that daughter "lacked evidence that their mother was a susceptible testator." *Id.* at ¶ 34. We determined that daughter

failed to meet her reciprocal burden of establishing the existence of a question of fact as to the element of susceptibility. *Id.* at ¶ 37. Because the daughter failed to meet her reciprocal burden on one of the essential elements of her claim, we affirmed the trial court's grant of summary judgment in favor of the sons. *Id.*

**{¶37}** Likewise, here, we conclude that the Estate met its initial *Dresher* burden of pointing to "some evidence" of the type listed in Civ.R. 56(C), to demonstrate that the Appellees could not support an essential element of their claim of undue influence, namely: the fact of improper influence attempted or exerted. *See West at 510-511.* Thus, the burden shifted to the Appellants to demonstrate that a material issue of fact remained as to this element. *Dresher* at 293.

**{¶38}** In their response, Appellant Daubel averred that, after Mr. Becks' stroke, Mr. Dineen exerted influence over Mr. Becks, causing him to revoke Appellant Daubel's power of attorney. Thereafter, Appellants decided that Mr. Becks would be best served if he was appointed a guardian. During the guardianship proceedings, Mr. Dineen attempted to remove Mr. Becks from the assisted living facility, and Adult Protective Services intervened. Based upon these events, Appellant Daubel averred that Mr. Becks was susceptible to undue influence, and that Mr. Dineen exercised undue influence over him. Dr. Wynkoop agreed that Mr. Becks was susceptible to undue influence, stating:

> His forgetfulness, problematic judgment, disinhibition, and limited insight and appreciation of his neurocognitive deficits and disinhibition left him vulnerable to undue influence after his stroke in May 2001, up to and including the time I evaluated him in August of 2002 and the time he signed his revised Will and Trust in April of 2002.

In his affidavit, Dr. Barnes agreed, averring that, due to his "weakened mental state," Mr. Becks was "susceptible to being influenced by other individuals."

{¶39} In further support of their claim for undue influence, Appellants provided the affidavit of a social services worker for the Sandusky County Department of Jobs and Family Services ("Protective Services"), Linda Ackerman, who averred that, on April 23, 2002, she received a report regarding the possible adult abuse, neglect, or exploitation of Mr. Becks. Between April 26 and May 22, 2002, Ms. Ackerman met with Mr. Becks several times. Ultimately, Protective Services determined that Mr. Becks had been exploited by Mr. Dineen, but, because a guardian had been appointed for Mr. Becks, Protective Services took no further action. However, Ms. Ackerman did not identify in what way Mr. Dineen had allegedly exploited Mr. Becks other than by purportedly influencing him to grant Mr. Dineen a power of attorney.

{¶40} The affidavits submitted by Appellants focus upon Mr. Becks' susceptibility to undue influence, and also provide averments that Mr. Dineen exerted influence over Mr. Becks *in regard to his power of attorney and his living arrangements.* However, Appellants pointed to no evidence which would raise a question of whether Mr. Dineen exerted influence over Mr. Becks to "overpower and subjugate" Mr. Becks' mind, or to "destroy his free agency" *in regard to the will and trust. See West* at 501; *see also Augsbury v. Hickerson*, 9th Dist. No. 23301, 2007-Ohio-364, ¶ 11, quoting *West* at 510-11 ("General influence, however strong or controlling, is not undue influence unless brought to bear *directly upon the act of making the will.*" (Emphasis added.)). Because the Appellants bore the burden of proof on this matter, and because they failed to meet their reciprocal *Dresher* burden of proof on the third essential element of undue influence, the trial court properly granted summary judgment to the Estate on this claim. *See Kryder* at ¶ 30, citing *Cefaratti* at ¶ 24-27 (the failure of a party to meet his burden as to any one of the essential elements of his claim can be dispositive).

**{¶41}** Accordingly, to the extent that Appellants argue that the trial court erred in granting summary judgment to the Appellees on the claim of undue influence, we overrule their second and third assignments of error.

### III.

**{¶42}** Appellants' first assignment of error is overruled. Appellants' second and third assignments of error are sustained to the extent that they argue that the trial court improperly granted summary judgment to the Estate on the claim regarding lack of testamentary capacity. To the extent that the Appellants' argue that the trial court erred in granting summary judgment to the Appellees on the claim regarding undue influence, their second and third assignments of error are overruled. The judgment of the Lorain County Probate Court is affirmed in part, reversed in part, and this matter is remanded to the probate court for further proceedings consistent with this opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the

period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

CARLA MOORE
FOR THE COURT

DICKINSON, J.
CONCURS.

BELFANCE, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶43} I concur in the majority's resolution of the Appellants' first assignment of error. In addition, I concur that summary judgment must be reversed with respect to the claim of lack of testamentary capacity. However, I respectfully dissent from the majority's conclusion that summary judgment was appropriately granted in favor of the Estate with respect to Appellants' claim of undue influence, as I would conclude that there remains a genuine dispute of material fact.

{¶44} "The essential elements of undue influence are: (1) a susceptible testator, (2) another's opportunity to exert influence on the testator, (3) the fact of improper influence exerted or attempted, and (4) a result showing the effect of such influence." *Kryder v. Kryder,* 9th Dist. No. 25665, 2012-Ohio-2280, ¶ 30. The majority asserts that Appellants failed to present evidence of prong three: "the fact of improper influence exerted or attempted[.]" *Id.* As I believe there was sufficient evidence presented whereby one could reasonably infer that

improper influence was exerted or attempted resulting in changes to the will and trust, s*ee id.,* I would conclude that summary judgment was inappropriately granted on this claim.

**{¶45}** The majority does not appear to dispute that there was evidence that Mr. Becks was a susceptible testator or that Mr. Dineen had the opportunity to exert influence over Mr. Becks. Thus, my analysis will focus on prongs three and four.

**{¶46}** According to affidavits submitted by the non-movants, for 25 years prior to his death, Mr. Becks spent every major holiday with the Buccis and the Daubels. Mr. Dineen, who is an attorney, lived in Youngstown and had maintained very little contact with Mr. Becks. After Mr. Dineen learned of Mr. Beck's condition, he began visiting him and hired attorneys for Mr. Becks, despite the fact that Mr. Becks already had an attorney. Mr. Dineen also caused Mr. Becks to revoke Mr. Dabuel's power of attorney. Although Mr. Dineen had physically cleaned out Mr. Beck's Sheffield Lake apartment and cancelled his lease, Mr. Dineen promised Mr. Becks he would return him to his apartment.

**{¶47}** Linda Ackerman from the Sandusky County Department of Jobs and Family Services submitted an affidavit averring that allegations were made that Mr. Becks was being exploited by Mr. Dineen who held financial power of attorney over Mr. Becks. There was concern that Mr. Dineen was using his position of Attorney-in-Fact to exploit money from Mr. Becks. During the investigation, Mr. Dineen refused to provide any information relevant to the handling of Mr. Becks' finances. The Adult Protective Services Unit concluded that Mr. Becks had been exploited by Mr. Dineen; however, the agency did not take further action because a guardian was appointed for Mr. Becks. In addition, Ms. Ackerman attested that, although Mr. Dineen had engaged various attorneys to work on Mr. Becks' behalf, Mr. Becks indicated that he

had no knowledge of the attorneys. She also concluded that Mr. Dineen was exerting influence over Mr. Becks in part to manipulate him.

**{¶48}** In addition, the trust document contains a provision allowing Mr. Dineen to remove the Trustee of the trust for any reason after the death or incapacity of Mr. Becks. Further, Martha Wilhelm, Mr. Becks' niece, submitted an affidavit asserting that,

> [f]ollowing the execution of the Will and Trust at issue in this lawsuit, when I told [Mr. Becks] that he was not only disinheriting Philip, Lisa, and myself, but also all of our children to whom he was very close, [Mr. Becks] acted like he did not understand what I was talking about. He stated he would never think of disinheriting anyone, especially his grandnieces and grandnephews.

**{¶49}** While there is more evidence in the record, I would conclude that viewing the evidence in the light most favorable to the nonmovants, the Appellants satisfied their reciprocal burden with respect to prongs three and four. *See Kryder* at ¶ 30. From the above evidence, one can infer that Mr. Dineen exerted influence over Mr. Becks that resulted in alterations to the will and trust that Mr. Becks did not intend or desire. Moreover, this case is completely distinguishable from *Kryder* given the complete absence of evidence, either direct or circumstantial in that case concerning susceptibility. *See Kryder,* 2012-Ohio-2280, at ¶ 37. Accordingly, I would reverse the trial court's judgment granting summary judgment on the claim of undue influence.

APPEARANCES:

JAMES W. HART, and CARL J. KAMM III, Attorneys at Law, for Appellants.

JOHN A. MURPHY, JR. and KRISTEN S. MOORE, Attorneys at Law, for Appellee.