[Cite as *Carpenter v. Carpenter*, 2023-Ohio-274.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
BELMONT COUNTY

MARY LOU CARPENTER, INDIVIDUALLY, AND AS ADMINISTRATRIX
OF THE ESTATE OF JERRY N. CARPENTER, DECEASED,

Plaintiff-Appellee,

v.

ROGER D. CARPENTER, INDIVIDUALLY, AND AS TRUSTEE OF THE
CARPENTER FAMILY TRUST U/A DATED JANUARY 27, 2014, ET AL.,

Defendants-Appellants.

---

**OPINION AND JUDGMENT ENTRY**
Case No. 21 BE 0049

---

Civil Appeal from the
Court of Common Pleas of Belmont County, Ohio
Case No. 18-CV-22

**BEFORE:**
David A. D'Apolito, Gene Donofrio, Cheryl L. Waite, Judges.

---

**JUDGMENT:**
Affirmed.

---

*Atty. Erik A. Schramm, Atty. Kyle W. Bickford* and *Atty. Erik A. Schramm, Jr.,* Hanlon, McCormick, Schramm, Bickford & Schramm Co., LPA, 46457 National Road West, St. Clairsville, Ohio 43950, for Plaintiff-Appellee and

*Atty. Clifford C. Masch* and *Atty. Brian D. Sullivan*, Reminger Co., L.P.A., 101 West Prospect Room, Suite 1400, Cleveland, Ohio 44115, for Defendants-Appellants Timothy P. Jarvis and Jarvis Law Office, LLC.

Dated:  January 27, 2023

**D'Apolito, P.J.**

{¶1} Appellants, Jarvis Law Office, LLC ("JLO") and Attorney Timothy Jarvis, JLO's sole member, ("Jarvis")[1], appeal two judgment entries issued by the Belmont County Court of Common Pleas. In the first judgment entry, the trial court awarded partial summary judgment in favor of Appellee, Mary Lou Carpenter, individually and as Administratrix of the Estate of Jerry N. Carpenter, deceased, and against Appellants on claims for intentional interference with expectation of inheritance ("IIEI"); lack of capacity relating to the Carpenter Family Trust u/a dated January 27, 2014 ("Trust"), in which Jerry, who suffered from dementia and resided in a nursing home at the time the Trust was created, is the grantor; undue influence; and fraud. Appellants likewise appeal a second judgment entry, in which the trial court sustained Mary Lou's unopposed motion for damages. The trial court awarded damages in the amount of $147,742.03[2], and

---

[1] Jarvis's professional liability carrier denied coverage for the claims asserted in this lawsuit. At his deposition, Jarvis explained that he switched carriers, and verified that he was securing a "claims-made" policy, but he later learned that his current liability carrier defined "claims-made" as "claim[s] where the underlying event took place after they were the carrier." (Jarvis Depo., p. 70.) Jarvis conceded the "onus was on [him] for not reading through the contract. (*Id.*) As a consequence, Jarvis represented himself and JLO before the trial court. However, Jarvis and JLO retained counsel for this appeal.

[2] According to the partial motion for summary judgment on damages, the damages award is divided as follows:

$40,088.43 for the improper extinguishment of Mary Lou's life estate;

$55,207.58 for the loss of one-half of the oil and gas lease, which was executed after she transferred her life estate to the Trust;

$20,602.94 for the loss of the oil and gas royalties and her intestate share;

$10,750.00 based on her intestate share for the necessary tax payments as a result of "Defendant's failed defective grantor trust";

$11,164.00, which reflects the amount billed for the various legal documents prepared by Jarvis and JLO; and

$9,929.08 for Jerry's funeral.

The damage calculation is not before this Court on appeal.

---

Case No. 21 BE 0049

attorneys' fees, costs, and expenses in the amount of $87,969.17. This appeal is limited to the attorneys' fees award.

**{¶2}** In her amended complaint, Mary Lou asserts claims for IIEI, lack of capacity, fraud, and conversion against JLO, Jarvis, Jerry's son, Roger Carpenter, both individually as the beneficiary of the Trust, and in his capacity as the trustee, Jerry's son, David Carpenter, the co-beneficiary of the Trust, and Alexandra Manes, an attorney employed by JLO. Mary Lou asserts an undue influence claim against Roger both individually and on behalf of the Estate. Mary Lou further requests an accounting relating to the Trust, as well as declaratory and injunctive relief voiding the Trust. In the alternative, Mary Lou seeks an order directing the Trust to grant a life estate in the property to Mary Lou. She further seeks an order holding all income from an oil and gas lease executed after she transferred her life estate in the property be held in suspense by Gulfport Energy Corp. and Gulfport Appalachia, LLC "("Gulfport defendants") during the pendency of this case.[3]

**{¶3}** Roger, David, and the Trust ("Cross-Claimants") filed cross-claims against JLO and Jarvis for indemnification.[4]

**{¶4}** Prior to the entry of summary judgment, Mary Lou dismissed her claims against Manes without prejudice. Mary Lou dismissed her claims against Roger and David with prejudice after settling her claims against them.

**{¶5}** The claims asserted on Mary Lou's behalf and those she asserts on behalf of the estate are all predicated upon the legal representation provided by Jarvis and JLO to Mary Lou and Jerry, following Jerry's diagnosis of dementia and his admission to a long-term care facility.

---

[3] If an oil and gas lease is executed after a life estate is created, Ohio courts have observed that the life tenant is entitled to income from the property and the remaindermen are entitled to the corpus. Delay rentals are considered income. Royalties and leasing bonuses are considered a part of the corpus of the estate. At least one Ohio court has observed that the life tenant may collect the interest generated from the investment of the royalties and bonuses during the life tenancy. When the life estate ends, the remaindermen are entitled to the principle. *Fourth & Cent. Tr. Co. v. Woolley*, 31 Ohio App. 259, 165 N.E. 742 (1st Dist.1928).

[4] On October 4, 2021, the trial court granted the motion for partial summary judgment on indemnification filed by the Cross-Claimants. On November 9, 2021, the trial court sustained the Cross-Claimants unopposed partial motion for summary judgment on the issue of damages, awarding $80,039.30, reflecting the attorney's fees incurred by the Cross-Claimants during the above-captioned lawsuit. Neither judgment entry was appealed.

**{¶6}** According to Jarvis's deposition testimony, he was retained to preserve Jerry's assets through the creation of a spend-down trust for purposes of Medicaid. Mary Lou argues that she transferred her life estate in the property at issue in this appeal to the Trust in order to qualify Jerry for Medicaid. She further argues that her life estate had no impact on Jerry's ability to qualify for Medicaid, and that she was not informed by Jarvis, who was jointly representing Mary Lou and Jerry, that her life estate would not be returned to her after Jerry's death. Finally, Mary Lou argues that Jerry did not have the requisite capacity to create the Trust.

**{¶7}** In their sole assignment of error, Appellants assert that the trial court erred in granting summary judgment on the claims of IIEI, lack of capacity, and fraud as there exists genuine issues of material fact relating to the substantive elements of each claim. They further argue that the trial court erred in entering summary judgment in favor of Mary Lou and against Appellants on Mary Lou's undue influence claims, as they were asserted exclusively against Roger in the amended complaint. Finally, Appellants argue that the trial court erred in awarding attorneys' fees in the absence of a finding or malice and/or a right to punitive damages.

**{¶8}** For the following reasons, the judgment entries of the trial court granting partial summary judgment in favor of Mary Lou and against JLO and Jarvis on the substantive claims and awarding attorneys' fees to Mary Lou are affirmed.

## FACTS AND PROCEDURAL HISTORY

**{¶9}** A history of the life estate and the formation of the Trust at issue in this appeal informs our decision. In a November, 2007 deed Jerry reserved a life estate for himself, granted a life estate to his then-girlfriend Mary Lou, and named his three children and their spouses as the remaindermen in the property located at 55880 Pipe Creek Road in Bellaire, Ohio ("Property"). Jerry had previously inherited the Property from his late wife, who was the mother of his three children.

**{¶10}** In an April, 2013 deed the parties to the November 2007 deed reconfigured ownership of the Property, severing one acre (excepting the oil and gas) and conveying it to Jerry's daughter, conveying life estates to Jerry and his now-wife Mary Lou in the remaining acreage, with Roger and David named as the remaindermen.

Case No. 21 BE 0049

**{¶11}**  Jarvis attached an affidavit to the opposition brief to the motion for summary judgment, which summarizes the events leading to the creation of the Trust.  According to his affidavit, the first time that Jarvis met with Mary Lou and Roger was on January 17, 2014.  The parties discussed a plan to qualify Jerry for Medicaid while preserving his assets.

**{¶12}**  Until his deposition, Jarvis denied that Mary Lou was his client. However, Jarvis recognized at his deposition that legal representation in Ohio is predicated upon the client's reasonable expectations, and he conceded that it was reasonable for Mary Lou to expect that she was his client.  It is undisputed that the $11,000.00 fee charged for legal services provided by Jarvis and JLO was paid with joint funds belonging to Jerry and Mary Lou.

**{¶13}**  At the January 17th meeting, Jarvis explained the relevant Medicaid rules to Mary Lou and Roger and proposed a strategy involving the creation of an irrevocable trust.  Jarvis further explained that neither Jerry nor Mary Lou could be the beneficiary of the proposed trust, otherwise the trust would be considered a countable resource for Medicaid.

**{¶14}**  Jarvis informed Mary Lou and Roger that Jerry's life estate in the Property would not be considered regarding his qualification for Medicaid, but the life estate would be subject to Medicaid Estate Recovery.  After Jerry's death, any amount that Medicaid paid for his care could be recovered against the Property, up to the value of his life estate interest at the time of his death.

**{¶15}**  Jarvis further informed Mary Lou and Roger that Mary Lou's life estate interest would also not be considered regarding Jerry's qualification for Medicaid. However, if Mary Lou was admitted to a long-term care facility at some point in the future, the Property would likewise be subject to Medicaid Estate Recovery based on the value of Mary Lou's life estate at the time of her death.

**{¶16}**  Based on the foregoing information, Jarvis "explained that if the goal was to protect the [Property] to the greatest extent possible, from either Jerry or Mary Lou's Medicaid claims, they could terminate their life estate interests.  [He] offered this as an option only, not as a requirement in order to get Jerry eligible for Medicaid."  (Jarvis Aff., ¶ 8.)

**{¶17}** According to Jarvis, both Mary Lou and Roger agreed that forfeiting the life estates was "the better option." (Jarvis Aff., ¶ 9.) Jarvis provided the following alternatives relating to the potential forfeiture of Mary Lou's life estate:

> I explained that by giving up her life estate interest, Mary Lou would no longer have a legal right to live in the homestead property nor would she have the any rights to any future proceeds from any oil & gas income. I suggested that I could prepare an occupancy agreement, as well as an agreement specifying the appropriate division of any future oil & gas income. I explained that there would be an additional fee of $500 per agreement. [Mary Lou and Roger] indicated to me that the agreements were not necessary and they could work things out between them.

(Jarvis Aff., ¶ 9.)

**{¶18}** Jarvis admitted at his deposition that the potential Medicaid Estate Recovery based on Mary Lou's life estate would have no legal or financial impact on Mary Lou, only on the remaindermen in the Trust. Jarvis testified, "That would be money that the remaindermen would either have to come up with to buy out the State's lien or sell the Property and the State gets their cut." (Jarvis Depo., p. 286.)

**{¶19}** Jarvis further admitted that he did not separate Mary Lou and Roger when he explained the Medicaid rules regarding life estates and the legal effect of Mary Lou's potential transfer of her life estate to the proposed trust. However, Jarvis testified that he asked Mary Lou and Roger several times if they had any questions and if they understood the information that he had provided. Both Mary Lou and Roger interrupted him several times for clarification on various issues. They each indicated that they understood everything that Jarvis had explained.

**{¶20}** Jarvis conceded at his deposition that January 27, 2014, the day that Jerry executed the legal documents creating the Trust, as well as powers of attorney and a will, was the first time that he met with Jerry. Jarvis testified that he spent "a good hour" with Jerry explaining the legal effects of the documents. Their meeting took place in the lobby at the nursing home where Jerry resided.

**{¶21}** Jarvis testified that he was not aware of the specific reason that Jerry had been admitted to the nursing home. Jarvis opined that many of his clients who suffer from dementia reside in nursing homes due to their inability to physically care for themselves, not their mental limitations.

**{¶22}** Jarvis further testified that both Mary Lou and Roger warranted that Jerry had the requisite capacity to execute the proposed documents despite his diagnosis. Nonetheless, Jarvis recognized his responsibility to make an independent determination of Jerry's capacity before executing the documents.

**{¶23}** Jarvis testified that Jerry knew his children's names and identified Mary Lou as his second wife. In order to ascertain Jerry's knowledge of his assets, Jarvis asked Jerry if his total assets were valued at more or less than one million dollars. Jerry was amused by the question, and indicated that his net worth was far less than one million dollars. Jerry estimated that the Property was worth between $100,000.00 and $150,000.00. Jerry acknowledged that he lived "here," that is, the nursing home at the time, rather than on the Property.

**{¶24}** Melissa Evick, a non-lawyer employee of JLO who assisted Jarvis on January 27, 2014, corroborated Jarvis's testimony regarding Jerry's response to Jarvis's questions about his net worth. She further testified that Jerry was "perfectly rational in all respects" on that day. (Evick Depo., p. 128.)

**{¶25}** At his deposition, Jarvis conceded that he did not ask Jerry for his date of birth or address, nor did Jarvis ask Jerry to identify the day of the week or the month or year. Jarvis reasoned that he was only required to ascertain Jerry's awareness of the nature and extent of his assets and the identity of his natural heirs.

**{¶26}** Jarvis further conceded that Jerry did not read the trust document, despite a provision in the proposed trust that warranted Jerry had read the document in its entirety. Jarvis admitted at his deposition that he was not aware that Jerry was able to read, however there is no evidence in the record that Jerry was illiterate. Jarvis testified that he explained the purpose and effect of the proposed trust to Jerry. Jarvis asserted that many attorneys would not understand each and every provision.

**{¶27}** Jarvis testified that Jerry asked a few questions about Medicaid. Jerry also asked Jarvis to explain the purpose of the trust.

**{¶28}** Throughout the trial court and appellate proceedings, Mary Lou has represented that Jarvis admitted that he did not tell her that she could be evicted from the Property if she abandoned her life estate. Mary Lou repeatedly represents that Jarvis's response to this inquiry at his deposition was "I don't believe I did." To the contrary, the actual exchange at Jarvis's deposition is as follows:

Q:     Did you tell [Mary Lou] by herself *alone* that that could happen?

A:     I don't believe I did.

Q:     Did you put it in writing as a CYA?

A:     I think we talked about it in the meeting.

Q:     Did you put it in writing as a CYA?

A:     What I put in writing is right here [referring to the meeting notes].

Q:     Where in here does it say that you told Mary Lou what could happen if she does this?

A:     That specifically is not spelled out. It's in regards to the occupancy agreement. It's not needed.

(Emphasis added)(Jarvis Depo., p. 231.)

**{¶29}** The depositions of Jarvis, Mary Lou, Roger, and Evick are in the record. Although Jarvis represented himself and JLO before the trial court, he did not participate in the depositions of Mary Lou, Roger, or Evick.

**{¶30}** Mary Lou provided the following testimony at her deposition. Mary Lou owned a restaurant, which she sold in 2003, the same year that Jerry's first wife, Ruth, died. Mary Lou and Jerry were married in 2010.

**{¶31}** Jerry was diagnosed with dementia shortly after he and Mary Lou were wed. He was admitted to the hospital after he injured his hip as the result of a fall in 2013. Mary Lou wanted Jerry to return to the residence they shared, but "they said, 'No, you can't

have him at home.' " (Mary Lou Carpenter Depo., p. 10.) Mary Lou did not define "they." Shortly thereafter, Jerry became a resident at Shadyside Care Center, a nursing home in Belmont County, Ohio.

{¶32} Mary Lou contacted JLO "because the nursing home said [Jerry] needed a trust to take care of him while he was in the nursing home." (*Id.*, p. 32.) Mary Lou presumed that Roger was with her when the nursing home administrator recommended Jarvis, based on the fact that Roger handled all of Jerry's financial matters.

{¶33} According to Mary Lou, the first meeting with Jarvis was conducted in the nursing home and Jerry and Roger were present. She sat in the lobby and did not participate in the conversation. Mary Lou's trial counsel intervened during the deposition to clarify that there was only one meeting at the nursing home with Jarvis and it occurred after Mary Lou and Roger attended a meeting with Jarvis at JLO.

{¶34} At the first meeting at JLO with Roger in attendance, Jarvis suggested the creation of a trust. Jarvis told Mary Lou and Roger that only one of them could perform the duties of the trustee. Because Roger had a college education, Mary Lou recommended that Roger act as trustee.

{¶35} Mary Lou could not recall anything Jarvis said regarding the proposed trust, simply that it would be designed to pay for Jerry's expenses at the nursing home. With respect to the proposed trust, Mary Lou recalled that Jarvis "pulled down a screen and wrote numbers and stuff up there on it." (*Id.*, p. 22.)

{¶36} At the second meeting at JLO, Jarvis told Mary Lou "[t]hat she needed to sign [her] lifetime rights over for Jerry to get on Medicaid because they were holding it against the house." (*Id.*, p. 27-28.) Mary Lou "just thought [she] was signing [the life estate] over for Jerry to get on Medicaid and everything would stay the same." (*Id.*)

{¶37} According to her deposition testimony, Mary Lou was unaware that she was permanently relinquishing her life estate to the Trust. She thought the transfer of her life estate was "temporary. [She] didn't know it was everything for the rest of [her] life." (*Id.*, p. 29.) When asked if Jerry's successful Medicaid application was "the goal," Mary Lou responded, "It wasn't a goal for me. They just told me I needed to do it." (*Id.*)

{¶38} According to Mary Lou, Jarvis did not explain the quitclaim deed transferring the life estate or its legal consequence. (*Id.*, p. 40-42.) She testified, "[t]here was no legal

advice, only for me to sign it." (*Id.*, p. 42.) She further testified that she "did not know the quitclaim deed and the lifetime rights were the same thing." (*Id.*, p. 40.)

{¶39} At the third meeting with Jarvis, which was conducted at the nursing home, Jarvis and Roger spoke with Jerry, while Mary Lou "[sat] off to the side." (*Id.*, p. 33.) She was not a part of the conversation, nor did she overhear any part of the conversation. However, Roger denied participating in Jarvis's roughly one-hour meeting with Jerry.

{¶40} When Mary Lou was asked if she discussed the proposed trust with Jerry prior to Jerry's meeting with Roger and Jarvis at the nursing home, Mary Lou testified that Jerry "would not have understood anything that anybody told him." (*Id.*, p. 43.) She further testified that Jerry would not have understood the concept of Medicaid or a trust designed to shelter assets.

{¶41} Mary Lou stated that Jerry had to re-sign the legal documents because his initial signature was illegible. (*Id.*, p. 36.) When asked why she allowed Jerry to sign the documents, Mary Lou responded, "I trusted Roger to do the right thing." (*Id.*)

{¶42} At his deposition, Roger testified that he was simply doing what Mary Lou and Jarvis had decided in earlier meetings was the proper course and in Jerry's best interest. At the first meeting with Mary Lou and Jarvis, Roger described the two as "very well acquainted and completely on board." (Roger Carpenter Depo., p. 60.) After the creation of the Trust was described by Jarvis, Roger stated that he asked Mary Lou, "Are you okay with this plan?" She responded, "Yes, absolutely." (*Id.*)

{¶43} However, Roger summarized Jarvis's explanation to Mary Lou regarding the transfer of her life estate to the Trust as follows:

> The reason why it had to be signed over is because the State of Ohio Medicaid could still consider that an asset and that it would be used and drained as part of the spend-down for Medicaid. In other words, her life estate would actually cause her to probably lose the house and living there.

(*Id.*, p. 57.) Roger testified that Jarvis told Mary Lou that the Property constituted "a countable resource for Medicaid." (*Id.*, p. 58.)

{¶44} In his affidavit, Roger avers that Mary Lou and Jarvis, at the January 27, 2014 meeting, "proposed to [Roger] the formation of a Trust with fifty percent (50%) of

Case No. 21 BE 0049

[Jerry's] liquid assets going to the Trust and the other fifty percent (50%) going outright to [Mary Lou] *in exchange for* Mary Lou's giving up the life estate, which is the subject of this case." (Emphasis added)(Roger Carpenter Aff., ¶22.) At his deposition, Roger testified that Jarvis offered to draft an occupancy agreement for Mary Lou at the January 17, 2014 meeting. Specifically, Roger testified, "I do know that at that meeting in January, they offered her an occupancy agreement, but she didn't feel that she needed it." (Roger Depo., p. 134.)

{¶45} Roger, an associate professor of nursing at West Virginia University, testified that he made no effort to independently ascertain Jerry's cognitive ability, but instead, relied on Mary Lou's representations that Jerry's mind was failing. Roger explained that medical professionals intentionally avoid diagnosing family members, terming the decision a "professional boundary." (Roger Depo., p. 22.)

{¶46} When asked if he attended any of Jerry's doctor appointments, Roger responded that "[Jerry's] wife took him." (Roger Depo., p. 15.) Roger further claimed that Jerry's doctor could not discuss Jerry's infirmity with Roger due to privacy laws.

{¶47} According to Roger, the family decided that Jerry should stop driving when Mary Lou reported that Jerry suffered episodes of disorientation and agitation in the fall of 2013. The decision was also based on the fact that Jerry was prescribed Seroquel, which Roger described as having a sedating effect.

{¶48} According to Roger's affidavit, he visited Jerry at the nursing home on a weekly basis. At all times relevant to the creation of the Trust, Jerry could always remember and discuss current events, as well as talk about his children and his granddaughter, Colby.

{¶49} Roger further avers, "[f]rom my observation, I know that my father understood the nature and effect of the trust and the quit-claim deed; and, his goals (and Mary Lou's goals) were accomplished by the creation of an ongoing administration of the Trust." (Roger Aff., ¶ 28.) Roger continues that Jerry "expressed his idea that the [Property] was to be in the Trust and the 'kids' would end up owning the 'ground.'" Finally, Roger avers, "[Jerry] would tell me that his ultimate goal was that his only grandchild (Colby) would eventually own the [Property.]" (Roger Aff., ¶ 28.)

Case No. 21 BE 0049

**{¶50}** Roger testified that he trusted Mary Lou and they had a great relationship prior to the disagreement over the maintenance of the Property. Roger conceded that Mary Lou wanted to execute the oil and gas lease on the Property before the Trust was created. According to Roger, he declined to execute the lease prior to the transfer of the Property to the Trust because the oil and gas companies were "low-balling" the Carpenters. (Roger Depo., p. 101.) Roger asserted that the delay in executing the lease was the product of his desire to generate "maximum income to pay for [Jerry's] care." (Roger Depo., p. 102.) Roger denied that the delay was undertaken to foreclose Mary Lou from any financial gain.

**{¶51}** One of the deposition exhibits is a document captioned "Certification of Hospital Records." Attached to the certification is correspondence from Mary Lou's trial counsel to Steven Timms, M.D., a physician who treated Jerry for "Dementia and/or Alzheimers."

**{¶52}** The correspondence reads, in pertinent part, "[i]n an effort to avoid being forced to subpoena you for a deposition in this matter, please review the attached records and any other records in your possession. Upon your review, please complete, sign, and return the attached form to us * * *." In the check box form signed by Dr. Timms, he warrants to a reasonable degree of medical certainty that Jerry suffered from "[d]ementia and/or Alzheimer's disease" as of January 27, 2014, and that Jerry was incompetent as a result of "dementia and/or Alzheimer's disease" as of January, 2014." (Jarvis Depo., Exh. 20.)

**{¶53}** A series of documents, captioned "MEETING FOCUSER," were offered as deposition exhibits. The first meeting focuser, dated December 5, 2013, memorializes a meeting conducted by Evick and identifies the clients as "Jerry and Mary Lou Carpenter." The handwritten notes read, in relevant part, "3 yrs Dementia; fell hip 11-8; at 10 Lakes – walking with walker doing better; not going home; Atty. Tomlin [the attorney who drafted the deeds granting the life estates to Jerry and Mary Lou]."

**{¶54}** The second meeting focuser, dated December 19, 2013, memorializes a meeting conducted by Evick and identifies the client as "Carpenter." The meeting focuser lists various amounts held in Jerry's individual retirement account, life insurance policies, and joint bank accounts in the names of Jerry and Mary Lou.

**{¶55}** The third meeting focuser, dated January 13, 2014, memorializes a meeting conducted by Evick with Mary Lou and Roger and once again identifies the client as "Carpenter." The handwritten notes read, in pertinent part, "Oil +Gas? $100,800 16 acres $6300 – 100% $78K-75%". A section of the meeting focuser captioned "next action," indicates that a "vis[ion]/design" meeting set for January 17, 2014 with Jarvis.

**{¶56}** The fourth meeting focuser, dated January 17, 2014, memorializes the meeting conducted by Jarvis with Mary Lou and Roger. The clients are identified as Jerry and Mary Lou. The handwritten notes read, in pertinent part, "Goals: Get MCD – protect Assets." Relevant to the above-captioned appeal, additional handwritten notes read, in pertinent part:

H+W have life estate only

No OCC agreement needed – they can work together

Nothing needed for future O+G – they will work out between them

Seem to get along well

\* \* \*

Explained that if we build life estate into trust, may open property to estate recovery. Told them we could do separate occupancy agreement for ML. They said not needed – they can work together. May be signing O+G lease at some point – don't have one yet. Asked if they needed any agreement for O+G – they said they can come to agreement between them. Told them we don't do O+G leases [illegible].

Boys will be only bens of trust.

ML will keep ½ of countable assets other ½ will go to trust.

Roger [sic] + ML will give up life estate to avoid asset recovery. Roger + ML seem like they get along well + in agreement on everything. Both want to make sure Dad is taken care of [sic].

Case No. 21 BE 0049

{¶57} Ultimately, both Jerry and Mary Lou conveyed their life estates by quitclaim deed to the Trust. Roger and David likewise transferred their remainder interest in the Property to the Trust. Jerry subsequently transferred the remainder of his assets to the Trust. Jerry's sons are the beneficiaries of the Trust and Roger is the Trustee. In addition to the Trust, Jerry executed a will, a living will, a health care power of attorney, a general power of attorney (naming both Mary Lou and Roger) and the quitclaim deed transferring his life estate to the Trust.

{¶58} The retainer agreement identifies Jerry and Mary Lou as JLO's clients, however, the retainer agreement was executed by Roger. Jarvis conceded at his deposition that Roger had no authority to execute the retainer agreement on behalf of Mary Lou. Roger likewise had no authority to bind Jerry, prior to the execution of the POA. Jarvis could not recall the order in which the documents were executed, but acknowledged that Roger did not add "POA" to his signature on the retainer agreement. (Jarvis Depo., p. 165-168.)

{¶59} There are a series of typographical errors in the documents executed on January 27, 2014. For instance, the location where the documents were signed are incorrect. Of greater concern, the memorandum of trust identifies both Jerry and Mary Lou as the grantors.

{¶60} A few months after the Trust and related documents were signed by Jerry, on or about April 11, 2014, Roger, acting in his capacity as Trustee, executed an oil and gas lease between the Trust and the Gulfport defendants. Roger and David, as beneficiaries of the Trust, executed a ratification of the oil and gas lease dated July 27, 2015. Jerry died on August 12, 2016.

{¶61} At Roger's deposition, he conceded that Jerry wanted Mary Lou to continue to reside on the Property until she died. When the HVAC system malfunctioned, Mary Lou scheduled a meeting with Manes at JLO to determine her responsibility for maintaining the Property.

{¶62} In correspondence dated January 27, 2017, Alexandra Manes, on behalf of JLO, notified Mary Lou that the law office was unable to provide any information regarding the administration of the Trust, as JLO had been "retained by Roger to represent the [Trust]." (1/27/17 Letter, p. 1.) The correspondence continues:

Therefore, we are unable to discuss this case with you, as we are required to maintain confidentiality for our clients and protect the attorney-client privilege.

Further, we are unable to provide you with any legal advice or recommendation, as that would be in direct conflict of interest to our client. You are welcome to hire an attorney if you would like to obtain legal advice.

I understand that you have concerns about the house you currently live in as it is owned by the [Trust]. At this time, unfortunately we are only able to provide you with confirmation that the house is owned by the [Trust] and we are working on the trust administration process with the Trustee, Roger. Until you are informed otherwise, you may continue to live at the house, and you are responsible for all utility and other maintenance expenses for the time you are living there.

(*Id.*)

**{¶63}** Next, Mary Lou wrote a letter to Roger requesting financial assistance to replace the HVAC system. When Roger did not respond, she contacted her current counsel. Angered by Mary Lou's decision to retain counsel in the matter, Roger threatened to evict Mary Lou from the Property. Shortly thereafter, this action was filed. The trial court granted a temporary restraining order/preliminary injunction prohibiting Roger from evicting Mary Lou from the Property.

**{¶64}** On October 4, 2021, the trial court entered partial summary judgment in favor of Mary Lou and against JLO and Jarvis on Mary Lou's claim for IIEI, and on her undue influence claim both individually and on behalf of the Estate. The trial court also entered summary judgment in favor of Mary Lou and against JLO and Jarvis on the Estate's claim that Jerry lacked testamentary capacity to execute the estate planning documents on January 27, 2014. The trial court predicated summary judgment on four facts: (1) Mary Lou did not have to extinguish her life estate in order for Jerry to qualify for Medicaid; (2) Jarvis did not advise Mary Lou that she could be evicted from the Property in the absence of the life estate or an occupancy agreement, nor did he

Case No. 21 BE 0049

recommend that she retain separate counsel; (3) Jerry was incompetent as he suffered from dementia on January 27, 2014, and "did not arrange for the creation of the [ ] Trust," (J.E., p. 6); and (4) Jerry did not read the Trust prior to its execution. In a separate judgment entry, the trial court entered summary judgment in favor of Mary Lou on her unopposed motion for damages.

**{¶65}** This timely appeal followed.

## STANDARD OF REVIEW

**{¶66}** This appeal is from a trial court judgment resolving a motion for summary judgment. An appellate court conducts a *de novo* review of a trial court's decision to grant summary judgment, using the same standards as the trial court set forth in Civ.R. 56(C). *Grafton v. Ohio Edison Co.,* 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). Before summary judgment can be granted, the trial court must determine that: (1) no genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence most favorably in favor of the party against whom the motion for summary judgment is made, the conclusion is adverse to that party. *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). Whether a fact is "material" depends on the substantive law of the claim being litigated. *Hoyt, Inc. v. Gordon & Assoc., Inc.*, 104 Ohio App.3d 598, 603, 662 N.E.2d 1088 (8th Dist.1995).

**{¶67}** "[T]he moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." (Emphasis deleted.) *Dresher v. Burt*, 75 Ohio St.3d 280, 296, 662 N.E.2d 264 (1996). If the moving party carries its burden, the nonmoving party has a reciprocal burden of setting forth specific facts showing that there is a genuine issue for trial. *Id.* at 293. In other words, when presented with a properly supported motion for summary judgment, the nonmoving party must produce some evidence to suggest that a reasonable factfinder could rule in that party's favor. *Doe v. Skaggs*, 7th Dist. No. 18 BE 0005, 2018-Ohio-5402, ¶ 11.

**{¶68}** The evidentiary materials to support a motion for summary judgment are listed in Civ.R. 56(C) and include the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact that have been filed in the case. In resolving the motion, the court views the evidence in a light most favorable to the nonmoving party. *Temple*, 50 Ohio St.2d at 327.

## ANALYSIS

## ASSIGNMENT OF ERROR

**THE COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE CLAIMS OF FRAUD, IIEI, UNDUE INFLUENCE, AND LACK OF CAPACITY IN LIGHT OF THE EXISTENCE OF A GENUINE ISSUE OF MATERIAL FACT ON THE SUBSTANTIVE ELEMENTS OF EACH OF THESE CLAIMS.**

**{¶69}** Appellants advance a single assignment of error with several subarguments divided according to the trial court's findings of fact. In addition to the assertion that genuine issues of material fact precluded summary judgment, Appellants assert that Mary Lou's undue influence claim was alleged exclusively against Roger in both the original and amended complaints. Finally, Appellants challenge the award of attorney fees in the absence of a finding of actual malice or an award of punitive damages.

## INTENTIONAL INTERFERENCE WITH EXPECTATION OF INHERITANCE (ASSERTED BY MARY LOU INDIVIDUALLY)

**{¶70}** The elements of the tort of IIEI are: (1) an existence of an expectancy of inheritance in the plaintiff; (2) an intentional interference by a defendant with the expectancy of inheritance; (3) conduct by the defendant involving the interference which is tortious, such as fraud, duress or undue influence, in nature; (4) a reasonable certainty the expectancy of inheritance would have been realized, but for the interference by the defendant; and (5) damage resulting from the interference. *Firestone v. Galbreath*, 67 Ohio St.3d 87, 88, 616 N.E.2d 202 (1993).

Case No. 21 BE 0049

**{¶71}** It is undisputed that Jerry's intent was for Mary Lou to continue to reside on the Property, and reap the benefits of the life estate, until she died. But for Jarvis's intentional interference, that is, his misrepresentation that Mary Lou's life estate would prevent Jerry from qualifying for Medicaid, and his concealment of the fact that the life estate would not be returned to her after Jerry's death, Mary Lou would have retained her life estate in the Property.

**{¶72}** Moreover, Jarvis averred that Mary Lou and Roger determined that the relinquishment of Mary Lou's life estate was "the better option." Roger should not have participated in that determination because his interest, as one of the beneficiaries of the proposed trust, was directly at odds with Mary Lou's interest. Jarvis conceded that the remaindermen, that is, the beneficiaries of the proposed trust, Roger and David, would suffer the financial consequences of Mary Lou's life estate, should she enter a long-term care facility.

**{¶73}** Insofar as Mary Lou relinquished her life estate based on the undue influence and fraud committed by Jarvis and JLO, her legal counsel, due to an incorrect recitation of Ohio law, we find that the trial court did not err in entering summary judgment in favor of Mary Lou on her IIEI claim.

## LACK OF CAPACITY (ASSERTED BY MARY LOU AS ADMINISTRATRIX)

**{¶74}** The mental capacity required to create or amend a revocable trust is the same as that required to execute a will. R.C. 5806.01. Courts apply the test for testamentary capacity in determining a person's capacity to execute trust documents. See *Newcomer v. Roan*, 2016-Ohio-541, 56 N.E.3d 408, ¶ 109 (6th Dist.); *Daubel v. Dineen*, 9th Dist. Lorain No. 11CA009994, 2012 WL 6561262, 2012-Ohio-5924, ¶ 19; *Lah v. Rogers*, 125 Ohio App.3d 164, 175, 707 N.E.2d 1208 (11th Dist.1998).

**{¶75}** The test for testamentary capacity is whether the person "has sufficient mind and memory: [f]irst, to understand the nature of the business in which he is engaged; [s]econd, to comprehend generally the nature and extent of his property; [t]hird, to hold in his mind the names and identity of those who have natural claims upon his bounty; [and] [f]ourth, to be able to appreciate his relation to the members of his family." *In re Estate of*

*Flowers*, 2017-Ohio-1310, 88 N.E.3d 599, ¶ 84 (6th Dist.), quoting *Niemes v. Niemes*, 97 Ohio St. 145, 155, 119 N.E. 503 (1917), paragraph four of the syllabus.

**{¶76}** Evidence that a person had dementia is insufficient by itself to establish the person's lack of testamentary capacity; there must be evidence that dementia actually affected the person's capacity to make the testamentary disposition. *In re Estate of Goehring*, 7th Dist. Columbiana No. 05 CO 27, 2007-Ohio-1133, ¶ 60; *Garber v. Schneider*, 1st Dist. Hamilton No. C-210568, 2022-Ohio-1777, ¶ 23, *Martin v. Dew*, 10th Dist. Franklin No. 03AP-734, 2004-Ohio-2520, ¶ 19.

**{¶77}** Courts apply this standard in considering a settlor's capacity to execute trust documents that form a part of an estate plan. See, e.g., *Lah v. Rogers*, 125 Ohio App.3d 164, 175, 707 N.E.2d 1208 (11th Dist.1998); *Neumeyer v. Estate of Penick*, 180 Ohio App.3d 654, 2009-Ohio-321, 906 N.E.2d 1168, ¶ 47 (5th Dist.). The party seeking to void the agreement due to a lack of capacity has the burden of proof by clear and convincing evidence. *Lah* at 175, 707 N.E.2d 1208. "Clear and convincing evidence is that evidence 'which will provide in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.' " (Internal citations omitted.) *State v. Garcia*, 126 Ohio App.3d 485, 487, 710 N.E.2d 783 (12th Dist.1998).

**{¶78}** Jarvis conceded that Jerry executed the Trust and related documents within one hour of their first and only meeting. Jarvis further conceded that he did not know the reason that Jerry resided in a nursing home, and Jerry did not read the Trust document despite the fact that Jerry warranted within the document that he read it in its entirety. Mary Lou testified that she did not explain the proposed estate plan to Jerry prior to January 27, 2014.

**{¶79}** Simply stated, one hour is an inadequate amount of time to determine Jerry's capacity to execute the Trust and related documents, to thoroughly explain the legal effect of the Trust and the related documents, for Jerry to thoughtfully consider the proposed plan, and for Jerry to execute the Trust and related documents. Accordingly, we find that the trial court did not err in entering summary judgment in favor of the Estate on the lack of testamentary capacity claim.

## UNDUE INFLUENCE (ASSERTED BY MARY LOU INDIVIDUALLY AND AS ADMINISTRATRIX)

{¶80} Next, Appellants argue that the trial court entered judgment in favor of Mary Lou on her undue influence claim against Jarvis despite the fact that the undue influence claim was asserted by Mary Lou individually and on behalf of the Estate exclusively against Roger. The allegations under the caption "undue influence" from the amended complaint are identical to the allegations asserted in the original complaint. A review of the allegations reveals that the only undue influence claims that are asserted are: (1) by Mary Lou individually against Roger; and (2) by Mary Lou as Administratrix on behalf of Jerry against Roger. Mary Lou does not address this argument in her appellate brief.

{¶81} Despite the undue influence claims alleged exclusively against Roger in the amended complaint, the undue influence argument in Mary Lou's motion for summary judgment is captioned, "Defendants [Jarvis and JLO] unduly influenced [Mary Lou and Jerry.]" Further, in the body of the argument, Mary Lou asserts, ""Mary Lou is an unsophisticated older person and was susceptible to [Jarvis's] influence." (MSJ, p. 18.) Further, in the opposition brief to the motion for summary judgment, Jarvis, who represented himself and JLO, argued the substance of the undue influence claim. Jarvis did not assert a lack of notice.

{¶82} Civ.R. 15(B), captioned "Amendments to Conform to the Evidence," reads, in relevant part, "[w]hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Implied consent is established where it appears that the parties understood that the evidence was aimed at the unpleaded issue. *Oxford Mining Co., LLC v. Ohio Gathering Co., LLC*, 7th Dist. Belmont No. 19 BE 0016, 2020-Ohio-1363, ¶ 28, citing *State ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41, 448 N.E.2d 1159 (1983), paragraph two of the syllabus. We have observed that "[a]n unpled affirmative defense can be 'tried' with consent in the course of the summary judgment motion practice." *Oxford Mining* at ¶ 28, citing *Church at Warren v. Warzala*, 11th Dist. Trumbull No. 2016-T-0073, 2017-Ohio-6947, ¶ 19. Accordingly, we find that Jarvis's consent to litigate the undue influence claims can be implied from his failure to raise his lack of notice of the claim on summary judgment.

Case No. 21 BE 0049

**{¶83}** In order to prove undue influence, a plaintiff must prove four elements: (1) the individual in question was susceptible to undue influence; (2) another person had the opportunity to exert undue influence over the susceptible individual; (3) improper influence was exerted or attempted; and (4) the result shows the effect of such influence. *West v. Henry*, 173 Ohio St. 498, 501, 184 N.E.2d 200 (1962); *Huntington v. Riversource*, 7th Dist. No. 14 MA 90, 2015-Ohio-5600, 45 N.E.3d 1053, ¶ 40.

**{¶84}** Mary Lou was susceptible to Jarvis's undue influence insofar as Mary Lou relied on Jarvis's legal advice regarding Jerry's ability to qualify for Medicaid. Jarvis conceded that Mary Lou was his client. The record reflects that Jarvis failed to inform Mary Lou that the existence of her life estate would have no impact on Jerry's ability to qualify for Medicaid. Jarvis likewise failed to adequately explain the legal effect of the quitclaim deed on Mary Lou's life estate.

**{¶85}** With respect to Jerry, we find that the roughly one hour Jarvis spent with Jerry, during which he purportedly ascertained Jerry's capacity to execute the Trust and related documents, explained the Trust and related documents, and executed the Trust and related documents, was woefully inadequate to accomplish the foregoing tasks, particularly in light of Jerry's infirmity. As a consequence, we find that the trial court did not err in entering summary judgment in favor of Mary Lou individually and on behalf of the Estate on the undue influence claim against Jarvis and JLO.

## FRAUD (ASSERTED BY MARY LOU INDIVIDUALLY AND AS ADMINISTRATRIX)

**{¶86}** In order to prevail on a claim of fraud, a plaintiff must demonstrate the following elements:

(1) a representation or, where there is a duty to disclose, concealment of a fact,

(2) which is material to the transaction at hand,

(3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,

(4) with the intent of misleading another into relying upon it,

(5) justifiable reliance upon the misrepresentation or concealment, and

(6) a resulting injury proximately caused by the reliance.

*Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 169, 462 N.E.2d 407 (1984); *KSMAC Holdings, Ltd. v. Ice Zone Realty, Ltd.*, 7th Dist. Mahoning No. 21 MA 0001, 2022-Ohio-1456, ¶ 51. Fraud must be shown by clear and convincing evidence. *Matter of Estate of W.*, 7th Dist. Jefferson No. 16 JE 0017, 2017-Ohio-7128, ¶ 25.

**{¶87}** Jarvis represented that Mary Lou's life estate would be an impediment to Jerry's ability to qualify for Medicaid. Jarvis conceded at his deposition that the foregoing is a misstatement of Ohio law. Jarvis made the misrepresentation, and at the same time, concealed the fact that Mary Lou would be permanently relinquishing her life estate in the Property. Mary Lou testified that she relied on Jarvis's misrepresentation and concealment when she signed the quitclaim deed. Mary Lou's reliance was justified insofar as Jarvis was acting as her legal counsel. Mary Lou suffered a resulting injury proximately caused by Jarvis and JLO when she was evicted from the Property. Further, and as previously stated above, it strains credulity that Jarvis fully informed Jerry of the legal effect of the Trust and the related documents, or provided Jerry the requisite amount of time to consider the legal effects of the executed documents, in the roughly one hour he spent with Jerry on January 27, 2014.

**{¶88}** Accordingly, we find that the trial court did not err in entering summary judgment in favor of Mary Lou and against Jarvis and JLO on the fraud claims asserted by Mary Lou individually and on behalf of the Estate.

## ATTORNEYS' FEES

**{¶89}** An award of attorneys' fees is subject to an abuse of discretion standard of review. *Motorists Mut. Ins. Co. v. Brandenburg*, 72 Ohio St.3d 157, 160, 648 N.E.2d 488 (1995). Abuse of discretion connotes more than an error of law; it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶90} It is well-settled that the award of attorney fees is appropriate in two specific instances. The first instance, where statutorily authorized, is not applicable here. The second instance is in situations when punitive damages would be appropriate, that is, the conduct is so egregious as to constitute fraud, malice, bad faith or wantonness. *Columbus Finance v. Howard*, 42 Ohio St.2d 178, 327 N.E.2d 654 (1975); *Village of Oakwood v. Makar*, 11 Ohio App.3d 46, 463 N.E.2d 61 (1983). Attorney fees are recoverable as compensatory damages by a plaintiff in an action in which punitive damages are proper. *Clary v. Pittman*, 7th Dist. Monroe No. 848, 2001-Ohio-3495,*3.

{¶91} In establishing a claim for punitive damages in an action for fraud, the plaintiff must demonstrate, in addition to proving the elements of the tort itself, " 'that the fraud is aggravated by the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious.' " *Davis v. Sun Refining & Marketing Co.*, 109 Ohio App.3d 42, 58, 671 N.E.2d 1049 (1996), quoting *Charles R. Combs Trucking, Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883 (1984), paragraph three of the syllabus. "Actual malice" requires proving that the debtor acted in the form of either (1) hatred, ill will, or a spirit of revenge, or (2) a conscious disregard for the rights of others, which had a great probability of causing substantial harm. *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174 (1987).

{¶92} Having reviewed the record, we find that Mary Lou established particularly gross or egregious wrongdoing by Jarvis. Jarvis's failure to represent the respective interests of his clients, Jerry and Mary Lou, is evident from the fact that he failed to inform Mary Lou that she and Jerry would suffer no consequence from the retention of her life estate in the Property. Likewise, Jarvis failed to ascertain Jerry's cognitive abilities or determine Jerry's intentions prior to the day that the Trust and related documents were executed. In addition to spending roughly one hour with Jerry, during which the documents at issue were executed, Jarvis misrepresented within the Trust document that Jerry had read the document in its entirety. Finally, Jarvis denied that Mary Lou was his client from January of 2017, when she contacted JLO regarding the furnace replacement, until his deposition in January of 2019, when he begrudgingly conceded that it was reasonable for her to assume that he was her lawyer. Accordingly, we find that the trial court did not abuse its discretion with respect to the attorneys' fee award.

Case No. 21 BE 0049

**CONCLUSION**

**{¶93}** For the foregoing reasons, the judgment entries of the trial court granting partial summary judgment in favor of Mary Lou and against JLO and Jarvis on the substantive claims, and awarding damages to Mary Lou, are affirmed.

Donofrio, J., concurs.

Waite, J., dissents in part with dissenting in part opinion.

Waite, J., dissenting in part.

**{¶94}** While I concur with the majority in regard to its conclusions on the issues of capacity and undue influence, I respectfully dissent on the issues of IIEI and the award of attorney fees.

**{¶95}** I begin by noting that the IIEI claim does not involve any inheritance at all. Instead, it stems from Mary Lou, not Jerry's, life estate. The majority concludes that Appellees' actions interfered with Mary Lou's right to *her* life estate, which belonged to her before her marriage with Jerry and was completely unaffected by his death.

**{¶96}** A quick review of the timeline at issue is helpful, here. In November of 2007, Jerry executed a deed reserving a life estate for both himself and Mary Lou. *Majority Opinion* at ¶ 9. His three children were named remaindersmen. Jerry and Mary Lou married in 2010. In April of 2013, he restructured the deed to sever one acre in favor of his daughter. *Id.* at ¶ 10. As to the remaining acreage, he again reserved a life estate for himself and Mary Lou. His remaining two children were named remaindersmen.

**{¶97}** In January of 2014, the discussion regarding the Medicaid application between Jarvis, Roger, and Mary Lou resulted in Mary Lou and Jerry giving up their life estates. *Id.* at ¶ 57. Mary Lou was permitted to remain in the house, even without a life estate. Jerry died in 2016. Roger threatened to evict Mary Lou in 2017 when she retained counsel regarding a dispute as to repairs to the property, leading to the instant litigation. *Id.* at ¶ 62-63.

**{¶98}** As stated by the majority, one of the elements of IIEI is "an existence of an expectancy of inheritance in the plaintiff." *Id.* at ¶ 70. The majority does not mention in the analysis that Mary Lou's life estate was created in 2007, long before any discussion of a Medicaid trust. Thus, her right in the life estate was created by deed, not by a testamentary document, and is in no way affected by Jerry's death. The majority concludes that the interference arose when Jarvis did not notify Mary Lou that she would permanently lose her life estate. While Mary Lou did testify that she failed to understand she would lose her life estate, this fact is irrelevant when considering an IIEI claim that must be based on some right expected to be received through some type of inheritance.

As such, I believe that Mary Lou's preexisting life estate cannot serve as the basis for an IIEI claim.

**{¶99}** Even if her claim was based on Jerry's life estate, Mary Lou could not have any expectation of inheritance concerning a right (a life estate) that ended with Jerry's death. In other words, Jerry's rights in the property extinguished on Jerry's death, thus there is nothing for Mary Lou to inherit.

**{¶100}** Secondly, I disagree with the majority's decision to affirm the imposition of attorney fees. I take no position as to whether sufficient evidence exists to support a finding of actual malice or conduct that is particularly wrong or egregious, because a procedural hurdle prevents our review of this issue. Attorney fees are permitted where a trial court makes a finding for punitive damages. Ohio law is clear that "an award of punitive damages is available only upon a finding of actual malice." *Bizfunds, L.L.C. v. Jetmo, Inc.*, 8th Dist. Cuyahoga No. 111032, 2022-Ohio-3815, ¶ 49, quoting *Wills v. Kolis*, 8th Dist. Cuyahoga No. 93900, 2010-Ohio-4351, ¶ 47-48, citing *Berge v. Columbus Community Cable Access*, 136 Ohio App.3d 281, 316, 736 N.E.2d 517 (10th Dist.1999). See also *Levy v. Seiber*, 2016-Ohio-68, 57 N.E.3d 331 (12th Dist.). The judgment entry in the case omits a finding of actual malice or that the conduct is particularly wrong or egregious. Thus, I would remand the matter to allow the trial court to determine whether actual malice was present.

**{¶101}** For these reasons, I respectfully dissent in part as to the majority's conclusion regarding the IIEI claim and award of attorney fees.

———————————————

For the reasons stated in the Opinion rendered herein, the assignment of error is overruled and it is the final judgment and order of this Court that the judgments of the Court of Common Pleas of Belmont County, Ohio, are affirmed.  Costs to be taxed against the Appellants.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure.  It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

## NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**